OPINION OF THE COURT
Gary J. Weber, J.
This is an application pursuant to CPL 330.20 (10) brought on behalf of the defendant patient Leonard Giardina (hereinafter Giardina) by the New York State Commissioner of Mental Health for an order permitting the unescorted furlough of this defendant into the community at large.
The application has been vigorously opposed by Assistant Suffolk County District Attorney Susan I. Braitman, Esq., on behalf of District Attorney James M. Catterson, Jr.
This statute provides that the court must grant the application if it finds that the issuance of a furlough order is "consistent with the public safety and welfare of the community and the defendant”.
Moreover, "[i]f the defendant fails to return to the secure facility at the time specified in the furlough order, then, for purposes of subdivision nineteen of this section, he shall be deemed to have escaped.”
CPL 330.20 (19) provides, in part, that in the event of an escape "immediate notice of such escape shall be given by the department facility staff to: (a) the district attorney, (b) the superintendent of state police, (c) the sheriff of the county where the escape occurred, (d) the police department having jurisdiction of the area where the escape occurred, (e) any person the facility staff believes to be in danger, and (f) any law enforcement agency and any person the facility staff believes would be able to apprise such endangered person that the defendant has escaped from the facility. Such notice shall be given as soon as the facility staff know that the defendant has escaped from the facility and shall include such information as will adequately identify the defendant and the person or persons believed to be in danger and the nature of the danger. The notices required by this subdivision shall be given by the facility staff physician who was treating the defendant or, if unavailable, by the defendant’s treatment team leader, but if neither is immediately available, notice must be given by some other member of the clinical staff of the facility. Such notice must be given by any means reasonably calculated to give prompt actual notice. The defendant may be apprehended, restrained, transported to, and returned to the facility *449 from which he escaped by any peace officer, and it shall be the duty of the officer to assist any representative of the commissioner to take the defendant into custody upon the request of such representative.”
In other words, if a furloughed defendant should fail to voluntarily reappear at the facility from which he was released by the time designated for his return, then the entire resources of the State’s criminal justice system will be put to work on a priority basis to apprehend him.
In light of this, it is clear that the Legislature has determined that, where a defendant has not complied with the terms of a furlough, his swift return to custody is as important as the expeditious arrest of the worst and most dangerous of felony criminal offenders.
The order proposed by the Commissioner contains provisions calling for both good behavior on the part of the defendant while on furlough as well as his mandatory return on certain predesignated dates to the psychiatric facility. However, conformity, including the required return to the facility, rests completely upon the good faith and the credibility of assurances of compliance by the defendant.
The worth of any pledge made by the defendant in this respect must be measured as with all people, in the nature, character and integrity of the individual giving it.
Moreover, CPL 330.20 (10) requires that the court, "[u]pon receipt of [this] application, the court may, on its own motion, conduct a hearing to determine whether the application should be granted, and must conduct such hearing if a demand therefor is made by the district attorney. If the court finds that the issuance of a furlough order is consistent with the public safety and welfare of the community and the defendant, and that the clinical condition of the defendant warrants a granting of the privileges authorized by a furlough order, the court must grant the application and issue a furlough order containing any terms and conditions that the court deems necessary or appropriate.”
In interpreting this statutory language the issue again turns on the nature and character of the defendant. If the defendant were a shoplifter or petty thief with no violent criminal history and proper medical evaluations indicated that a furlough would be of benefit to the defendant, without potential harm to the community, then, it would seem that, under such circumstances, an application of the kind now at bar ought to be granted.
*450 On the other hand, where the nature and character of the defendant is otherwise, the reviewing court must take into account the potential danger posed by the defendant’s unsupervised entrance into the community. This is particularly so where, as here, obedience to any conditions laid down by the court lies, at least initially, in the sole discretion and province of the defendant.
Thus, the court finds it necessary to examine the particulars of the defendant’s underlying crimes as well as those records pertaining to him as were supplied by the litigants and the court file.
In rendering the determination to follow the court has examined the application itself together with its attached exhibits and the affidavit of Erlina Cabatu dated September 20, 1994 (Suffolk County Ct file No. 2196-82 entitled People v Giardina), the medical records of the defendant from Kings Park Psychiatric Center certified January 5, 1995 and a letter of diagnosis by Dr. Harold Zoltán dated May 8, 1985.
The defendant was originally indicted in Suffolk County for the murder of his mother, Bertha Giardina, in December 1981.
Giardina gave a statement to a Suffolk County detective on August 10, 1982 wherein he admitted this murder.
The defendant beat his mother with his fists and a wooden stick and then manually strangled her to death. The beating was severe enough to break her ribs and right arm.
The defendant then choked to death a pet dog which had been living in his mother’s house.
After garroting the dog, he wrapped his mother’s body in a bed sheet and bound it with cord. Giardina continued to live in the house with the dead bodies for two or three weeks before leaving for Pennsylvania.
Giardina was finally arrested in Pittsburgh, Pennsylvania, while sitting on a hill staring down at a young girl in a swimming pool.
It is reported that Giardina has stated that if he were released he would kill his sister, Martha Bruno, because she looked a lot like his mother.
A review of the information provided with the application, exhibits I and II, reflects the defendant was known to have a dangerous mental condition at least from 1981 when he murdered his mother until August of 1987 when he was deemed to be mentally ill. In April of 1989 the defendant was *451 considered to be "doing well”. But, within a month he started to "decompensate”, become withdrawn, irritable, paranoid, and assaultive. The most recent report is dated October 14, 1994 and is based upon a review of the recommendations made on September 27, 1994 as supplemented by an affidavit dated September 20, 1994.
The record also reveals that as recently as September of 1993 the defendant was involved in a fight with another "patient” in which both were injured.
The original prognosis made when the court referred the defendant for a CPL article 730 examination was poor. The diagnosis at the time of the present application is schizophrenia, undifferentiated, and chronic. The original prognosis also recognized the intractable nature of the defendant’s condition.
Most significantly Dr. Harold Zoltán in his letter to the court dated May 8, 1985 has warned that, given the defendant’s long history of mental illness and the unprovoked murder of his mother, Giardina poses a significant and dangerous risk to the public safety.
One examiner feels that the defendant is "stable and is considered ready to try unescorted furlough”. Such a heuristic approach to the clear and present danger posed by this murderous and mentally ill defendant to the interests of the public safety and welfare is unacceptable.
Another examiner has reported to the court that the benefit of an unescorted furlough is that it will enable the defendant to "go shopping”.
Under the circumstances demonstrated by this record to suggest that such a supposed benefit in any way equates with the harm which could be caused by loosing such a human time bomb as Giardina upon an unsuspecting general public must be charitably characterized as ludicrous.
The court is of the opinion that experiments involving this man so as to in any way compromise the security of the People of this State are simply not acceptable or appropriate.
The court finds that the nature and character of the defendant is such that, under present circumstances, there is no showing that could be made whereby a furlough of this particular defendant could be shown as warranted. In this respect, the public ought not to be further burdened with the considerable expense of a hearing which can have only one reasonable outcome.
As the court interprets CPL 330.20 (10) it is necessary to *452 conduct a hearing on this matter only if "a demand therefor is made by the district attorney.” Since the District Attorney opposes this application, no hearing is presently necessary.
In passing, the court notes that the record would seem to indicate that this defendant is able to move freely about the Kings Park Psychiatric Center. Although this aspect of the matter is not now before the court, it would seem to the court that a review of the status of this defendant as well as other such similarly situated violent offenders by the appropriate authorities would be both wise and prudent.
The clerk of the court is directed to strike this matter from the January 30th Hearing Calendar of the court.
The application of the State Commissioner of Mental Health requesting permission for the unescorted furlough of Leonard Giardina is hereby in all respects denied.